FILED

2005 Jul-12  AM 11:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | |
|---|---|
| **CAROLYN S. FINLEY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **CIVIL ACTION NO. 04-HS-1174-E** |
| | ) |
| **SERVICE CORPORATION** | ) |
| **INTERNATIONAL and** | ) |
| **LOU NOWLIN,** | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM OF OPINION

This case comes before the court on the *Motion for Summary Judgment* (doc. 10) filed by the defendants ECI Alabama Services, d/b/a Forestlawn Gardens ("SCI"),[1] and Lou Nowlin. Argument on the motion was heard on June 1, 2005.

## PROCEDURAL HISTORY

This cause was commenced on June 8, 2004, when the plaintiff Carolyn Finley filed a complaint in this court. The complaint asserted actions against the defendants

---

[1]ECI Alabama Services was identified in the complaint as SCI Corporation International. ECI Alabama Services reports that the plaintiff's nomenclature is incorrect, and that ECI Alabama Services is its proper title. Because ECI appears to have done business as SCI at the time of the events in question, and because the witnesses uniformly refer to ECI as SCI, the court will refer to the defendants as SCI.

in five counts.  In count one, the plaintiff asserts a cause of action of unlawful discrimination due to a hostile work environment in violation of section 703(a)(1) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. § 2000e-2(a)(1). In count two, the plaintiff asserts a cause of action for unlawful retaliation pursuant to section 704(a) of Title VII.  42 U.S.C.A. § 2000e-3.  In count three, the plaintiff brings a cause of action for unlawful discrimination due to disparate treatment in violation of section 703 of Title VII, 42 U.S.C.A. § 2000e-2, and in violation of section 4(a)(1) of the Age Discrimination in Employment Act of 1967, as amended, 42 U.S.C.A. § 623(a)(1).  In count four, the plaintiff asserts a cause of action under Alabama state common law for assault and battery.  In count five, the plaintiff asserts a cause of action under Alabama state common law for unlawful detention.

The instant motion for summary judgment is brought by the defendants, and it seeks judgment on all counts.  The defendants submitted evidence[2] in support of their motion for summary judgment and filed a supporting brief (doc. 11) on February 23, 2005.  On March 14, 2005, the plaintiff filed evidence[3] in opposition to

---

[2]The defendants submitted the deposition of Carolyn S. Finley.  Affidavits and declarations were submitted from Lou Nowlin, Michael Coile, and James Kriegshauser. References to the deposition transcript are denoted by the last name of the deponent, followed by the abbreviation "Dep." followed by the page number or the deposition exhibit being referenced. Affidavits are denoted as "Aff."  Declarations are denoted as "Decl."  Documents are identified by their title and date.

[3]The plaintiff submitted the declaration of Carolyn S. Finley.

defendants' motion for summary judgment and a brief (doc. 13) in response to the defendants' motion for summary judgment.  The defendants filed a reply (doc. 18) on March 28, 2005.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  *Id.* at 324.

All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of*

3

*Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Chapman*, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *Anderson*, 477 U.S. at 249.

## FACTS

The employer, SCI, maintains a cemetery and mausoleum, and provides burial and related services to the public.  With one break in service, the plaintiff, Carolyn Finley, was employed by SCI from approximately January 14, 1999, to August 4, 2003.  During this time, Finley switched frequently between two positions with SCI in which she served essentially as a sales person of the services that SCI offers.  The first position is known as a Community Service Sales Counselor.  A Community Service Sales Counselor sells cemetery interment rights, merchandise, and services for the cemetery on what SCI refers to as a "Pre Need" basis.  (Def. Ex. 6.)  "Pre Need" is a type of sales service where counselors attempt to sell arrangements and services to individuals in anticipation of, that is, *prior to*, death.  (*Id.*)  The job involves making solicitations by phone, mail, and other means.  (*Id.*)

The other sales position is referred to as a Family Service Counselor.  The Family Service Counselor provides both "Pre Need" and "At Need" services.  "At

Need" refers to making sales and providing services at the time of, and immediately following, death. Family Service Counselors also were expected to provide "Pre Need" services based upon referrals from "At Need" families. (Def. Ex. 7.)

At the Forestlawn facility where the plaintiff was employed, the Family Service Counselors were scheduled to alternating weekly shifts of three days on one week and four days on the next. In addition, Family Service Counselors were on-call seven days a week. The hours of a Community Service Counselor are less clear, although the plaintiff worked six days a week when she filled this position. (Finley Dep. at 27.) SCI maintains that a Community Service Counselor does not need weekend access to the building, and therefore does not need keys. (Nowlin Decl., ¶ 17.) SCI also maintains that Community Service Counselors are not to answer in-coming calls while at the office.

Plaintiff, Carolyn Finley, born February 28, 1948, began working at Forestlawn Gardens as a Community Service Sales Counselor on January 14, 1999. (Finley Dep. at 95, 96.)    In April, 1999, Finley transferred from Community Service to work as a Family Service Sales Counselor. (Finley Dep. at 97.) A few months later, she transferred back to Community Service because she did not want to work on

Saturdays and wanted the weekend to spend time with her family and grandchildren.[4] (*Id*. at 97.)  On March 5, 2000, Finley faxed a letter to Forestlawn Gardens addressed "to whom it may concern" and resigned from the company, effective the next day, to take a position with another provider of death care benefits.  (Finley Dep. at 99;  Def. Ex. 8.)

Finley returned to SCI on or about March 8, 2001, as a Community Service Counselor.  (Finley Dep. at 104.)  On July 21, 2001, she transferred back to the position of Family Service Counselor.  (Finley Decl., ¶ 1.)  However, Finley states that she did not like working in Family Service and did so only because there was no one else to perform the job.  (Finley Dep. at 214-15.)

Lou Nowlin began working as the sales manager over Family and Community Services in July, 2002.  (*Id*. at 106-107.)  Prior to Nowlin's appointment as Sales Manager, Wayne Bishop served as Sales Manager.  (Finley Dep. at 108.)  Wayne Bishop now manages the maintenance crews and operations at the cemeteries.  (Finley Dep. at 108.)[5]

---

[4]Because this testimony implies that Community Service Providers do not work on Saturdays, it is somewhat in tension with Finley's other testimony that in the Spring of 2003 she worked six days a week as a Community Service Counselor.  (Finley Dep. at 27.)

[5]The defendants have adduced facts regarding SCI's anti-harassment policies.  However, because the defendants have not argued a *Faragher/Ellerth* affirmative defense, *see Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), as a ground for summary judgment, these facts are not pertinent to this Opinion.

Finley came into contact with Lou Nowlin on a weekly basis beginning in October, 2002. (Finley Decl. ¶ 15.)  She saw him at Gray-Brown each week for the sales meeting. (Finley Dep. at 35, 38.) It was not unusual from October, 2002 until March, 2003 for Finley to come into contact with or have communication with Lou Nowlin on a daily basis. (Finley Decl., at 15.)

As soon as Finley began having regular interaction with Nowlin, she experienced what she describes as his demeaning and intimidating managerial style and manner of communication. (*Id.*) These problems were exacerbated by the fact that Finley did not want to continue in Family Service.  When she would tell Nowlin about her desire to transfer out of Family Service, he would respond that if she did not work in Family Service, she would not work for SCI.  (Finley Dep. at 213.)

In response to these concerns, in January, 2003, Finley contacted Terry Tillman who was the Area Manager and Nowlin's supervisor (Finley Dep., at 133.)  She asked Terry if SCI would be phasing out Community Service Counselors.  Tillman informed her they would not be phasing out Community Service. (*Id.* at 11, 26.)   He said the Community Service counselors would phase themselves out by retiring or quitting. (Finley Decl. at 8.)  Finley complained to Tillman about Nowlin telling her if she came out of Family Service she would not be an employee of SCI. (Finley Dep. at 216.)   Finley spoke with Terry Tillman about her concerns on several occasions.

(Finley Dep. ex. 5.)

Lou Nowlin learned of Finley's communications with Tillman.  In response, he told her that if she ever went over his head again he would fire her. (Finley Dep. at 264.)

In early March, 2003, Finley fell and suffered a serious injury to her shoulder. (Finley Dep. at 257.) In approximately the second week of March, 2003, Nowlin instructed her to go on "short hours" and work from 10:00 a.m. until 2:00 p.m. (*Id*. at 258.)

In late March 2003, Finley experienced a problem with a customer.  The customer's father had passed away, and the customer wanted her father buried nearby the graves of the woman's twin babies. (Finley Dep. at 211.) However, the interment forms incorrectly identified the location of the babies' graves and, as a result, Finley could not locate the appropriate site.  (*Id*.)  Finley brought the problem to Wayne Bishop.  When Bishop thought he had located the correct grave, he told Finley to call the family into the office to correct the paperwork.  However, after the family had been called, Bishop determined that they still did not know the proper grave's location.  Bishop asked Finley to go to the visitation and speak with the family, but Finley refused.  She still had no idea where the twins were located and could not tell the family where their father would be laid to rest. (*Id*. at 12.)

8

Finley did not feel it was her job to handle this matter. (*Id*. at 210.) She called Nowlin, who was at home, and he refused to come in to speak with the family. (*Id*. at 213.)

Finley was sufficiently upset by this problem that she decided to resign her position with Family Services.  She describes the incident as the "last straw" among the dissatisfactions that she had with the position.  When she faxed in her ACAPS time sheet she wrote on it that she resigned from Family Services. (*Id*. ex. 3.)

On the weekend of March 22 and 23, 2003, Finley wanted to work but Nowlin would not let her because she had resigned.  (Finley Dep. at 218.)  Instead, Nowlin had Pat Watson substitute for Finley over the weekend, and Watson worked with the family in Finley's place. (*Id*. at 219.)  Finley came to the office on that Saturday and did some work, but not with the family. (*Id*. at 248.)

On Monday, March 24, 2003, Finley called the SCI employee complaint line, called the "Care Line," at approximately 9:10 a.m and reported her concerns about how Forestlawn Gardens was being managed. (Finley Dep. ex. 5.) She informed the Care Line that Lou Nowlin and Wayne Bishop spoke to her in a derogatory manner and that they threatened to fire her if she "went over their heads" with complaints to management. (*Id*.)

On Monday, March 24, 2003, Keith Brown, who was the area vice president,

9

called Finley about her complaints. (Finley Dep. at 135.)  Brown asked her to prepare a list of problems she experienced with SCI at Forest Lawn. (*Id.* at 136.) In the list, among other things, Finley listed specific concerns she had with the Sales Manager, Lou Nowlin. (Finley Dep. ex. 4.) She informed Brown that Nowlin "talks down to us showing no respect, he questions everything we say and do as if we are lying or misrepresenting the company." (*Id.*)

On March 25, 2003, Nowlin came to Finley's office to tell her he spoke with Michael Coile, Wayne Bishop and Terry Tillman and they all agreed that she should come out of Family Service and do only Pre Need work. (Finley Dep. exs. 7, 8.) Nowlin then told Finley to take her things to the first floor, which the employees also referred to as the basement. (*Id.* at 238, 240, 249.)  A disagreement ensued.  First, Finley attempted to tape record the exchange.  However, she changed her mind, and instead contacted the Care Line again.

At the time that Finley was moved to the first floor, the floor was used for storage and had a break room.  During this time, most employees were kept on the second floor, even though limited space sometimes required SCI to house two sales people in the same office.  (*Id.* at 277, 239.)  At the time that Nowlin asked Finley to move out of her office, he had not yet hired a replacement for her position with Family Service.  (Finley Dep. at 278.)

On March 25, 2003, the day after she resigned from Family Service and called the Care Line, she called the Care Line again.  (Finley Dep. ex. 7)  She reminded the intake specialist that she called the previous day "because she was in fear of losing her job" and stated that, on this particular day, Nowlin requested that Finley move her belongings to the "basement."  (*Id*.)  She stated that she believed that this request was retaliation for her Care Line complaints from the previous day.  (*Id*.)  She further commented that "Forestlawn Gardens is managed like a 'dictatorship'" and that she would like "Nowlin to treat counselors with respect."  (*Id*.)  In her call, she stated that she believed that Nowlin treated her unfairly by asking her to move to the "basement."  (*Id*.)  She then requested to speak with Michael Coile, Area Vice President, immediately.  (*Id*.)

On March 27, 2003, Coile had a meeting with Finley, Bishop, and Nowlin to discuss her concerns and her job change from Family Services to Community Services.  (Coile Decl., ¶ 2;  Finley Dep. ex. 8.)  Coile first assured Finley that she was not and would not be threatened with her job as a result of her Care Line calls.  (Coile Decl., ¶ 3.)  They discussed procedural challenges at the cemetery in relation to the way work interment orders were handled.[6]  (*Id*. at ¶ 4.)   Also, they discussed

---

[6]Interment orders capture information including the date of death, the type of casket, the time and date of burial, and identification of the burial plot.  (Finley Dep. at 139.)

maintenance issues that were causing problems for Family Services and developed a procedure that would ensure that changes would be made in a timely manner.[7] (Coile Decl., ¶ 4.)  Coile told Finley that she was asked to move out of her Family Service office due to her resignation from Family Service.  (*Id*. at ¶ 5.)  Finley told Coile that she did not resign verbally or sign anything stating that she resigned from Family Service.  (*Id*. at ¶ 6.)  When Coile questioned her about this representation, she stated that she did not understand what she was doing and that she was upset when she signed her ACAPS report with her resignation at the bottom.  (*Id*.)

Coile finally discussed the specific problems between Nowlin and Finley.  (*Id*. at ¶ 7.)  At the conclusion of the discussion, Finley agreed that perhaps her and Nowlin's personality were similar and that such similarities caused some of the conflict.  (*Id*. at ¶ 8;  *see also* Finley Dep. at 245.)  She does not think that Coile discriminated against her.  (Finley Dep. at 245.)

When the indoor meeting was adjourned, Nowlin, Bishop, Coile, and Finley agreed to try to do a better job of working with each other and keeping a good line of communication open. (Coile Decl., ¶ 9.) Coile documented his impressions from the indoor meeting in an email to Faye Eckblad of SCI on March 28, 2003.  (Finley Dep.

---

[7]Finley alleges that, at some point during the meeting, Bishop "drew back as if he was going to hit [her]."  (Finley Decl., ¶ 7(v).)

ex. 8.)  To resolve all of Finley's cemetery concerns, Finley, Nowlin, Bishop, and Coile drove to the cemetery and discussed policies and procedures that could aid in the resolution of cemetery problems.  (Finley Dep. at 148.)

After her resignation from Family Services, Finley was not allowed to answer the telephones.   (Nowlin Decl., ¶ 15.)  Further, Finley's business cards, which contained her previous title of Family Service Counselor, were removed from her former office and discarded.  (*Id*. at ¶ 16.)  On June 22, 2003, Nowlin ordered new business cards for Finley bearing the title Community Service Counselor.  (*Id*.; Def. Ex. 12.)

Some time after the event on March 27, 2003, SCI changed the locks on its Forestlawn facility.  Changing the locks on the doors at Forestlawn Gardens was unusual. (Finley Dep. at 279.)  Although SCI maintains that it follows a policy of changing the locks after an employee leaves employment with SCI, prior to March 25, 2003, several individuals either quit, fired or retired without SCI changing the locks after they left.[8]  (*Id*.)

Finley was not given a key to the new locks.  SCI maintains that this is consistent with its practice of not providing the Community Service Counselors with

---

[8]Finley identified Jan Hill, Kathy Simpson, Shane Johnson, Jerome Washington, April Tabor, Pat Bashears, Joan Eason, and Diane Kennedy as employees who left SCI without prompting SCI to change the locks following their departure.

keys.  (*Id*.)  Because Finley did not have a key to the office, after March 27, 2003, she

did not have access to Forestlawn after-hours and on the weekends.  Prior to March

27, 2003, she had a key to the office most of the time she worked for SCI. (Finley

Decl., at 12.)  Not having a key to the office forced her to make sales calls from her

home to the Anniston area, which were long distance calls. (Finley Dep. ex. 7.)

On April 2, 2002, Mark Hamilton, former Vice President of Prearranged Sales

for ECI's management company, SCI Management LP, set a minimum production

requirement for Community Service Counselors in order to be eligible for company

provided benefits. (Def. Ex. 13.)  Under this policy, counselors had to maintain sales

in excess of $5,000 a quarter to retain their health insurance benefits.  SCI generated

quarterly reports that listed all sales employees for ECI's nationwide group of

affiliates who failed to meet the minimum production requirements for that quarter

and thus lost their benefits.  (Def. ex. 14.)  SCI's quarterly reports indicate that

Finley's total income from sales for the second quarter of 2003 was $1,031.00, and

her average for the first two quarters of 2003 was $3,899.00, both of which were

below the $5,000.00 required by SCI's April, 2, 2002, policy.  (*Id*.)

On June 17, 2003, Nowlin informed Finley that, based upon her sales figures

and pursuant to the April 2, 2002, policy, she would be losing her medical insurance

benefits.  (Finley Dect., ¶ 7(b).)  Nowlin's position as Sales Manager does not give

him the authority to make decisions concerning benefits.  (*Id.*, ¶ 18.)

Finley again called Tillman to complain about the loss of her benefits.  (Finley Dep. at 256.)  On June 18, 2003, Nowlin met with Finley.  Finley states that Nowlin's purpose in meeting with her was to reprimand her for going "over his head."[9]

Finley responded that she would not sit there and listen to him threaten her and upset her.  Nowlin stood in front of the door, blocking her exit out to the parking lot. Nowlin told her that she was not going anywhere until she heard what he had to say. (*Id.* at 292.)  As she reached for the door he grabbed her arm and said "you aren't going to leave this time." (*Id.* at 293.)  He pulled her arm away from the door.  (*Id.*) Finley pulled her arm away from Nowlin and pushed him out of the doorway and ran to her car. (*Id.*)  She got into her car and locked the door. (*Id.* at 295.)  Finley was crying and shaking.  (*Id.*)  Nowlin followed her to the car, yelling at her and began tapping on the car window.  She rolled down the window and told Nowlin to move away from the car. (*Id.*)  She went to the police department to make a report of the incident. (Finley Dep. ex. 14.)  On June 25, 2003, Finley called Tillman to tell him of the incident. (*Id.* Ex. 10.)

_____

[9]Nowlin claims that he intended to convince her to accept a Family Service position at ECI's affiliated funeral home, Gray Brown-Service Mortuary ("GBS") because at GBS, Finley's scheduled duty days would be more frequent, allowing her to meet with more clients and therefore make more sales. (Nowlin Decl., ¶ 19.)  Nowlin reasoned that such a move would allow Finley to earn more money and thus restore her benefits sooner.  (*Id.*)  On summary judgment, Nowlin's version of events must be disregarded.

Finley claims that, in January of 2003, she was told by Tillman that the company was not going to phase out the Community Sales Counselor positions. (Finley Dep. at 262.) Following that conversation with Tillman, Finley never asked anyone whether the Community Service Counselor positions would be eliminated from the company. (*Id*.)

On July 9, 2003, Jim Kreigshauser, Vice President of Sales, informed Finley that her position as a Community Service Counselor was being eliminated because all Community Service Counselor positions were eliminated. (Kreigshauser Decl., ¶ 8.) Kreigshauser reports that Finley was the last Community Service Counselor working in Kreighauser's area of responsibility to be terminated. (*Id*. at ¶ 9.) The Community Service Counselor positions were eliminated nationwide by ECI's group of affiliated companies in a move to concentrate their sales efforts solely on Family Service. (*Id*. at ¶¶ 2-6; Def. ex. 15.) Prior to that time, Community Service positions were eliminated as counselors either resigned or retired. (Kreigshauser Decl., ¶ 7.)

Finley's position was eliminated effective August 4, 2003. Finley claims that, after she left the company, Janice Casey performed her same job duties as a Community Service Counselor. (Finley Dep. at 282.) Finley does not know Casey's age. (*Id.*)

During Finley's tenure with the company, five out of the six Family Service

Counselors hired by Nowlin were women and four out of the six were over the age of forty, with three of the six over the age of fifty.  (Def. ex. 16.)

## ANALYSIS

### I.   HOSTILE WORK ENVIRONMENT

To establish a hostile work environment claim, a plaintiff must show:

> (1) that she belongs to a protected group; (2) that she has been subjected to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that a basis for holding the employer liable exists.

*Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1244 (11th Cir. 2004).  SCI does not quarrel over whether Finley alleges membership in a protected group or whether she has alleged harassment.  SCI argues that there are no substantial disputes as to whether the harassment was based on Finely's sex and that the harassment was not sufficiently severe or pervasive to alter the terms and conditions of her employment. (*See* Def. Br. at 22-25; Reply at 6.)

"Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] ... because of ... sex.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).  This requirement is

17

important in this case because the plaintiff alleges several adverse acts, but even by the plaintiff's own reckoning, much of the adverse conduct was not committed "because of sex."

Finley argues that, in evaluating the harassment claim, the court should consider Nowlin's conduct of forcing her to move to a first floor office, the destruction of her business cards, his act of changing the locks without giving her a new key, and the act of excluding her from the weekly sales meeting. However, Finley plainly states that Nowlin did not engage in these acts "because of sex." Rather, she states that Nowlin took these action "in retaliation for me calling the CareLine."   (Finley Decl., ¶ m.)  Similarly, with regard to the incident of June 18, 2003, where Nowlin followed Finley out into the parking lot, Finley clearly states that Nowlin threatened her because she had "gone over his head" by talking to Tillman. (Finley Dep. at 291.)  While all of this conduct remains relevant to Finley's claim of unlawful retaliation, by the plaintiff's own admission, it does not constitute harassment because of sex.  Consequently, this conduct cannot form the basis of a sexual harassment claim.

Plaintiff testified that Nowlin's managerial style and manner of communication was demeaning and intimidating towards women.  (Finley Decl. ¶ 15.)  This allegation does constitute potentially harassing conduct because of sex.  Defendants

18

argue that they are entitled to summary judgment because the conduct is not sufficiently severe or pervasive.

A claim for sexual harassment due to a sexually hostile work environment must allege harassing conduct sufficiently severe or pervasive to alter the terms and conditions of employment. *See Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002). The requirement contains both an objective and subjective component. *Id.* The subjective component requires an allegation that the victim subjectively perceives the environment to be abusive. *Id.* Here, Finley has testified that she experienced Nowlin's managerial style and manner of communication to be demeaning and intimidating. (Finley Decl. ¶ 15.) Moreover, her complaints regarding Nowlin's manner were contemporaneously memorialized in her complaint to Area Vice-President Keith Brown on March 24, 2003. (Finley Dep. at 135.) Thus, the subjective component is met.

To evaluate whether Finley's allegations meet the objective component, the Court must consider, *inter alia*: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller*, 277 F.3d at 1276. "[T]he objective severity of harassment should be judged from the perspective of a reasonable person

19

in the plaintiff's position, considering 'all the circumstances.'" *Oncale*, 523 U.S. at 81.

Finley testified that Nowlin's demeaning communications with her were made on a daily basis. Daily conduct is objectively frequent. However, the conduct attested to by Finley falls short on the question of whether it is objectively severe, physically threatening, or humiliating. The only physically threatening conduct for which Finley has presented evidence is the incident of June 18, 2003. As discussed above, that conduct did not meet the threshold requirement of being motivated by the plaintiff's gender.

Although plaintiff attests that Nowlin's conduct was subjectively "demeaning" and "derogatory," she has not provided sufficient specific details to create a genuine dispute as to whether the conduct was objectively humiliating. The only example where she has provided specific details is her complaint that Nowlin did not accept Finley's assurance that she provided customers with laminated obituaries. (Finley Dep. at 135.) Instead, Nowlin verified Finley's answer with Pat Watson. While it may be unpleasant for a subordinate to work for a supervisor who does not take her at her word, this does not rise to the level of objectively humiliating conduct.

Based on the foregoing, the court holds as a matter of law that unspecified complaints of "demeaning" or "derogatory" communication, without more, are not

objectively severe so as to alter the terms and conditions of employment. "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (internal quotations marks and citations omitted). Taking as true the evidence offered by Finley and drawing all inferences in her favor, Finley has not met this standard. Accordingly, the defendants are entitled to summary judgment as to count one of the complaint.

## II.   RETALIATION

"To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action." *Stavropoulos v. Firestone*, 361 F.3d 610, 616 (11th Cir. 2004). Plaintiff bases her claim of retaliation on the following conduct: Nowlin's harassment and other threatening behavior, Nowlin's requirement that she move from the second floor to a first floor office after she resigned from Family Services, Nowlin's disposal of her business cards, her loss of weekend access to Forestlawn facility, the requirement that she not answer the phone, her loss of medical benefits, and her termination of employment. For the purposes of this motion, SCI concedes that

Finley's complaints regarding Nowlin's attitude towards women employees is protected conduct.  SCI moves for summary judgment on the ground that the alleged adverse treatment does not rise to the level of an adverse employment action and on the ground that the plaintiff lacks evidence of a causal link between the adverse treatment and the plaintiff's protected conduct.

### A.     *Termination*

SCI argues that Finley was terminated due to a national policy to eliminate the Community Service position.  SCI has adduced the affidavit of James Kriegshauser that he was responsible for the decision to eliminate her position.  Finley has no evidence that Kreigshauser was motived by retaliatory animus.  The individual that Finley claims desired to retaliate against her is Nowlin.  The undisputed evidence shows that Nowlin consistently sought to keep Finley in Family Services, and out of Community Services, a course of conduct which would have prolonged Finley's employment rather than imperil it.  (Finley Dep. at 213; Nowlin Decl., ¶¶ 4, 19.) Because Finely has failed to present any evidence rebutting SCI's proffered non-retaliatory reason for her termination, SCI is entitled to summary judgment.

### B.     *Loss of Medical Benefits*

SCI claims Finley's benefits were lost due to a company-wide policy that employees whose sales fell below $5,000 per quarter are not eligible for benefits.

Finley argues that her sales fell below the threshold only because Nowlin reduced her hours.  However, Nowlin reduced her hours following Finley's shoulder injury. Finley testified that the reduction of her hours facilitated her receiving necessary treatment for her injury. (Finley Dep. at 258-59, 264-65.) Finley further testified that she continued to receive this medical treatment up until her final day of employment. (*Id.*)  Finley presented no evidence that she ever asked to be put back on full-time. Because Finley cannot show that she did not acquiesce completely in being put on a part-time schedule, she has failed to show that SCI's proffered reason was a pretext. Accordingly, SCI is entitled to summary judgment on Finely's claim of retaliation based upon her loss of medical benefits.

## C.    *Changes Following Finley's Transfer to Community Service*

Finley alleges that several actions taken following her transfer to Community Service in March 2003 were taken in retaliation to her protected conduct of making complaints over SCI's Care Line.  The retaliation consists of Nowlin's requirement that she move from the second floor to a first floor office after she resigned from Family Services, Nowlin's disposal of her business cards, her loss of weekend access to Forestlawn facility, the requirement that she not answer the phone, and her exclusion from weekly sales meetings.

SCI's first argument is that there is no causal relationship between the alleged

adverse employment actions and Finley's complaints to the Care Line.  SCI presents several legitimate, non-retaliatory reasons for the changes Finley experienced following her transfer to Community Service in March of 2003.

First, SCI argues that Nowlin disposed of Finley's business cards because she changed positions.  It also adduces evidence showing that on June 2, 2003, Nowlin ordered new business cards for Finley.  Against this evidence Finley relies entirely on the proximity of her protected conduct and Nowlin's disposal of her business cards to show pretext.  In *Brungart v. Bellsouth Telecommunications, Inc.*, 231 F.3d 799, 791 (11th Cir. 2000), the Eleventh Circuit held that "[t]he general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection."  While temporal proximity generally is sufficient, in this case, given the undisputed evidence that Nowlin ordered new business cards for Finley, proximity alone is not sufficient to rebut SCI's proffered non-retaliatory reason for disposing of Finley's business cards.  Thus, SCI is entitled to summary judgment on Finley retaliation claim based upon the disposal of her business cards.

As to Finley's move to a first floor office, SCI presents Nowlin's testimony that Community Service personnel were located on the first floor.  Finley, however, rebuts

24

this testimony by testifying that Community Service personnel had offices on the second floor on prior occasions.  (Finley Dep. at 239.)   Furthermore, Nowlin's testimony also indicates that in March, 2003, there were no Community Service personnel other than Finley.  Lastly, given that by Spring, 2003, SCI already had determined to eliminate the position of Community Service Sales Counselor, a jury reasonably could infer that there was no legitimate reason to move Finley to the first floor.  Thus, Finley has created a genuine question as to whether SCI's legitimate, non-retaliatory reason for moving her to the first floor is a mere pretext.

SCI argues that the locks to the Forestlawn Facility were changed as part of its regular policy of changing the locks whenever it experienced a personnel change. Finley has successfully rebutted this argument by adducing testimony that on past occasions Forestlawn did not change the locks following personnel changes.  SCI also argues that Finley did not need access to the facility on weekends.  Finley, by contrast, testified that she worked six days a week.  (Finley Dep. at 27.)  SCI's own description of the Community Service Sales Counselor position indicates that the counselor's weekly schedule must be approved by the Sales Manager, which in Finley's case was Nowlin.  Thus, Nowlin's testimony that Finley did not work on Saturdays is incompatible with Finley's testimony that she worked six days a week. Based on this evidence, a reasonable jury could find that SCI's reliance on a regular

business practice of changing the locks is a mere pretext.

The next step in the analysis is to determine whether the retaliatory acts asserted by Finely constitute adverse employment actions.  "To be considered an adverse employment action for purposes of Title VII's anti-retaliation provision, the action must either be an ultimate employment decision or else must 'meet some threshold level of substantiality.'" *Stavropoulos v. Firestone*,  361 F.3d 610, 616 -617 (11th Cir. 2004).  When alleged retaliation does not involve  decisions such as termination, failure to hire, or demotion, the court must inquire "whether it rises to the level of substantiality." *Id.*  The "substantiality" inquiry "will normally depend on the facts of each individual case." *Bass v. Bd. of County Comm'rs.*, 256 F.3d 1095, 1118 (11th Cir. 2001).

In making a determination of substantiality, the court is mindful that "[n]ot every unkind act amounts to an adverse employment action." *Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1449 (11th  Cir. 1998).  "Any adversity must be material; it is not enough that a[n] [employment action] imposes some de minimis inconvenience or alteration of responsibilities." *Id.*   The threshold level of substantiality requires that the employment action be "'objectively serious and tangible enough' to alter the employee's 'compensation, terms, conditions, or privileges of employment ....'" *Stavropoulos*, 361 F.3d at 616-617 (quoting *Gupta v.*

26

*Fla. Bd. of Regents*, 212 F.3d 571 (11th Cir. 2000)).

Finley argues that these allegedly retaliatory acts "had the effect of depriving Finley of compensation which she otherwise would have earned in her employment with SCI." (Pla.'s Supp. Br. at 4.)  SCI's quarterly reports support this argument. These reports show that in the first quarter of 2003, Finley made $6,767 in sales, but in the second quarter, following her loss of weekend access to the facility, Finley's quarterly sales totaled $1,031. (Def. ex. 14.)  Although Finley's drop in sales could have other causes, a jury reasonably could infer that Finley's loss of weekend access played a role in depriving Finley of sales she "otherwise would have earned." Accordingly, Finley's allegation that SCI retaliated against her by barring her from the facility on weekends is objectively serious and tangible so as to alter Finley's compensation.  If credited by a jury, the testimony would support a conclusion that she suffered an adverse employment action.

*Collins v. State of Illinois*, 830 F.2d 692 (7th Cir. 1987), a case which bears many similarities to the instant case, also supports this conclusion.  There, the plaintiff was deprived of her own office, a telephone at her desk, printed business cards, and listings in professional publications as a library consultant. *Id.* at 704. The Eleventh Circuit has relied on *Collins* for the proposition that a deprivation of job responsibilities constitutes an adverse employment action. *See Dekalb County Sch.*

*Dist.*, 145 F.3d at 1452.  Finley's testimony that the lack of weekend access forced her call long distance to solicit potential customers from her home supports the conclusion that her lack of access to the facility altered her job responsibilities as well as her terms of employment.  Under *Collins*, it would be sufficient to constitute as an adverse employment action.

As for the remaining allegations of retaliation—the plaintiff's move from the second floor to a first floor office, her exclusion from weekly sales meetings, the requirement that she not answer the phone, and Nowlin's confrontation with the plaintiff on June 18, 2003 —while these actions, by themselves, might not rise to the level of an adverse employment action, the Eleventh Circuit has advised that courts are to consider retaliatory acts collectively, rather than in isolation.  *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998).  Accordingly, Finley's claim of unlawful retaliation based on this conduct cannot be resolved on summary judgment.

SCI's motion for summary judgment on Count II of the Complaint is due to be DENIED as to Finley's claim of retaliation based upon the changes Finley experienced following her transfer to Community Services in March, 2003, as explained above.  The motion is due to be GRANTED as to Count II in all other respects.

## III.   DISPARATE TREATMENT BASED ON SEX

Finley has failed to dispute SCI's argument that there is no evidence of disparate treatment on the basis of gender.  Therefore, SCI is entitled to summary judgment on this ground.

## IV.   DISPARATE TREATMENT BASED ON AGE

SCI's moves for summary judgment on Finley's ADEA claim on the ground that the plaintiff has failed to show a prima facie case because she has not shown that a substantially younger individual filled the position from which Finley was terminated.[10]   SCI argues that Finley cannot show that anyone was hired as a Community Service Counselor after her because the position was eliminated.

There is no direct evidence of age discrimination against Finley.  Instead, Finley relies on a circumstantial case to show that SCI discriminated against on the basis of her age.   In evaluating age discrimination claims based on circumstantial evidence, the Eleventh Circuit requires the plaintiff to initially satisfy "a four-part prima facie requirement: (1) that she was a member of the protected group of persons between the ages of forty and seventy; (2) that she was subject to adverse

---

[10]SCI also moves for summary judgment on the ground that SCI had a legitimate non-discriminatory reason for her termination.  Because the court will award summary judgment to SCI on its first argued ground, the court does not need to address SCI's purported legitimate, nondiscrminatory reason for Finley's termination.

employment action; (3) that a substantially younger person filled the position that she sought or from which she was discharged; and (4) that she was qualified to do the job for which she was rejected." *Damon v. Fleming Supermarkets*, 196 F.3d 1354, 1359 (11th Cir. 1999).  Furthermore, "[i]f a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1092 (11th Cir. 2004).

Finley testified that Janice Casey was hired after her and that Casey is "approximately eight years younger" than she is.  However, the court has struck the statement because it directly contradicts, without explanation, Finley's earlier deposition testimony that she lacked personal knowledge of Casey's age.  (Finley Dep. 281–83.)  Lacking this statement, Finely cannot make a prima facie circumstantial case of discrimination because she cannot show that a younger individual was retained or was hired to her position following Finley's termination.  Accordingly, SCI's motion for summary judgment on this claim is due to be granted.

## V.   STATE LAW CLAIMS

SCI argues that Finley's assault claim fails because Finley cannot show apprehension.  It argues that Finley's battery claims fails because she cannot show that Nowlin's touching was offensive.

Regarding claims of assault and battery, the Alabama Supreme Court has held as follows:

> 'A successful assault becomes a battery. A battery consists in an injury actually done to the person of another in an angry or revengeful or rude or insolent manner, as by spitting in the face, or in any way touching him in anger, or violently jostling him out of the way, or in doing any intentional violence to the person of another. The wrong here consists, not in the touching, so much as in the manner or spirit in which it is done, and the question of bodily pain is important only as affecting the damages. Thus, to lay hands on another in a hostile manner is a battery, although no damage follows; but to touch another, merely to attract his attention, is no battery and not unlawful. And to push gently against one, in the endeavor to make way through a crowd, is no battery; but to do so rudely and insolently is and may justify damages proportioned to the rudeness....' Furthermore, when there is conflicting evidence, as here, the issue of whether there was, in fact, an assault and battery at all is a question for the jury.

*Surrency v. Harbison*, 489 So.2d 1097, 1104 (Ala. 1986) (quoting *Singer Sewing Machine Co. v. Methvin*, 63 So. 997, 1000 (Ala. 1913)).

Finley's assault and battery count survives because Finley testified that Nowlin placed himself in her way to block her path, that Nowlin grabbed her angrily as she sought to exit, and that she was shaking and crying following her encounter with Nowlin. This evidence is sufficient to create genuine questions as to the offensiveness of the touching and the intent to create an apprehension of a battery.

31

Accordingly, SCI is not entitled to summary judgment on the plaintiff's claim of assault and battery.

SCI argues that Finley's unlawful detention claim fails because Finley cannot show that she was detained. A claim of unlawful detention is governed by Alabama Code section 6-5-170. Section 6-5-170 provides that "[f]alse imprisonment consists in the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." The Alabama Supreme Court has described the elements of a claim for false imprisonment as follows:

> "For there to be a false imprisonment, there must be some direct restraint of the person; however, it is not necessary that there be confinement in a jail or a prison. Any exercise of force, or the express or implied threat of force, by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go, is an imprisonment."

*Crutcher v. Wendy's of N. Ala., Inc.*, 857 So.2d 82, 92 (Ala. 2003).

Accepting Finley's rendition of the events of June 18, 2003, as true and drawing all inferences in her favor, the court finds that there is a dispute of fact as to whether Finley was deprived of her liberty for some length of time, albeit an exceeding brief length of time under any scenario. Finley's description of the interaction is as follows:

On June 18, 2003, Lou [Nowlin] was upset with me. He

32

> told me that I had gone his head [sic] for the last time.  I
> told him that I was not going to stay there and be talked to
> in that manner.  Lou told me that I was not going anywhere
> until I heard what he had to say.  Lou stood in front of the
> door, blocking my exit out to the parking lot.  I felt trapped
> by being alone with him in the basement and with him
> refusing to allow me to leave.  I reached for the door.  Lou
> grabbed by arm . . . I pulled my arm away and pushed him
> out of the doorway and ran to the car.

(Finley Decl. ¶ 7(v).)

From this description, a jury could find that Finley was deprived of her liberty from the moment that Nowlin said that Finley "was not going anywhere" until Finley "pushed him out of the way and ran to the car."  Accordingly, SCI is not entitled to summary judgment on the plaintiff's claim of false imprisonment.

## CONCLUSION

Based upon the foregoing, SCI's motion for summary judgment will be GRANTED as to Counts One and Three of the plaintiff's complaint; GRANTED IN PART and DENIED IN PART as to Count Two of the complaint; and DENIED as to Counts Four and Five.  A separate order shall be entered.

**DONE** and **ORDERED** this 12th day of July, 2005.


_____
**VIRGINIA EMERSON HOPKINS**
United States District Judge

33